298 P.2d 827

Theodorius E. McKEAN, Frank M. Spencer and R. L. Mitchell, Plaintiffs and Appellants,

v.

A. Adolphus LASSON, Glen D. Lasson, Bernard G. Lasson, Niels Oscar Lasson and George A. Siler, Defendants and Respondents.

No. 8448.

Supreme Court of Utah.
June 26, 1956.

---

**4.** See Clayton v. Bennett, 5 Utah 2d 152, 298 P.2d 531.

Dilworth Woolley, Manti, P. N. Anderson, Nephi, (deceased), for appellant.

Elias Hansen, Salt Lake City, for respondent.

WADE, Justice.

This suit was commenced by the plaintiffs and appellants to determine their rights to the waters of Thistle Creek and its tributaries as they flow northward in Utah County, from the Sanpete-Utah County boundary line downstream to the mouth of Nebo Creek. Appellants' lands are located below the lands owned by respondents except George A. Siler, who was made a party defendant by plaintiffs and appellants because he refused to become a party plaintiff and plaintiffs considered him a necessary party to the suit. We shall hereafter refer to the respondents as the Lassons.

Thistle Creek is a stream of water which arises in Thistle Valley in Sanpete County, Utah. This stream is fed by Clear Creek and Rock Creek in Sanpete County and by

Warm Creek, also called Panawats Slough, which slough arises in a spring in Thistle Valley and flows north and joins Thistle Creek about 10 rods north of the Sanpete-Utah boundary line. Thistle Creek flows in a northerly direction through the lands of the parties to this action and eventually joins waters of Spanish Fork Canyon, which flow into Utah Lake.

In 1894 a decree known as the Smith Decree was entered in the District Court for Utah County which adjudicated the rights in the waters of Thistle Creek between the users of those waters in Thistle Valley, also known as Indianola, and the users down the canyon. Thistle Valley is a round valley which narrows where the waters enter into Thistle Creek as it flows down the canyon. The Smith Decree only adjudicated the rights to the use of the water of Thistle Creek as between the upper users in Thistle Valley and the lower users in the Canyon. It did not adjudicate such rights as between the different users in the Canyon. This suit adjudicates only the rights to use the Thistle Creek waters as between the different users in the Canyon. There is usually enough water for all users of the stream until May 15 and usually a substantial amount after that date until June 15 or 25. The Smith Decree divided the water between the Valley and Canyon users for the period between June 15 and July 15 of each year, giving the Canyon users two 5-day turns from June 25 to June 30 and from July 10 to July 15, and the Valley users two

10-day turns, and thereafter the Valley users had the right to shut off the entire stream and the Canyon users got only the return flow, which of course meant the end of the irrigation season as far as the Canyon users were concerned. The Smith Decree did not fix the acreage or the duty of water nor establish the points of diversion.

In the instant case the evidence disclosed that for more than 50 years the Lassons had maintained watertight dams. These dams, for purposes of identification in this suit and beginning at the highest point on the stream where the Lassons diverted the waters and then going downstream, were called the Upper Wimmer Dam, the Lower Wimmer Dam and the White House Dam. Below these are the Spencer-McKean Dam and the McKean-Siler Dam, which are maintained by Spencer, McKean and Siler. The Lassons, because of the velocity of the waters and the fact that their lands have a substantial northerly slope towards the stream, also maintain a number of check dams on their lands to avoid erosion and the cutting of deep channels in their meadows. These check dams do not divert the waters but retard the flow of the stream, and by avoiding the cutting of deep channels help to maintain a reasonably high level of the ground water table through the meadows. This high water table helps the growth of the vegetation which consists of wild grasses which have shallow roots. There was expert testimony to the effect that by diverting and rediverting the water onto

their lands during high water season and thereby storing it, respondents' acts had a tendency to benefit the lands of appellants later on, because all the water which is not used up by transpiration and evaporation later finds its way into the stream by return flow or seepage later in the season when it is needed to irrigate the lands. The amount of the return flow depends upon the amount of water which had been diverted. There was evidence that when 50 second feet had been diverted and applied to the upper meadows, 60% would return to the stream; if 20 second feet were diverted, 50% would return, and if only 5 second feet were diverted, no surface water would return, although there would be some return by seepage.

The evidence further disclosed that it had been the custom for more than 50 years for the Lassons to divert all the water which was in Panawats Slough and Thistle Creek from June 15 to September 1 onto their upper meadows, and no water was diverted onto their lower meadows during that period. After September 1, water was again diverted on their lower meadows at the White House Dam, where a tight dam was maintained until May 15. Up to May 15 there had usually been sufficient water for everyone, the make of the stream and what water flooded over the dams being enough to supply the lower water users. From May 15 to June 15, if Spencer or McKean needed more water, they would go up the stream for it and the Upper Dams would be adjusted so that about ⅕ of the stream would be allowed to go down to the lower users. Although one of the Lassons testified that it was about ¼ of the stream, and appellants testified they took what they regarded as their fair share of the stream, other Lassons testified it was about ⅕ of the stream. As to this controverted fact, the court found it was ⅕ during this period, and we are of the opinion that it was not unreasonable for the court to so find from the evidence adduced. From June 15 to July 15, the parties to this suit divided the water during their turns so that ¾ would go to the Lassons and ¼ to the lower users.

The court found that for more than 50 years the parties to this action and their predecessors in interest were entitled to and had beneficially used all the water which finds its way into Thistle Creek from the boundary line between Utah and Sanpete County, and that the owners of this right had distributed the water among themselves so that it was used on the various amount of acreage each owned. The court further found that the highwater season usually extends "from about March 1st to June 15 when the snows from the watershed are melting and the low water period extends through the remainder of the year. The flow of the stream is augmented from time to time by rains which fall on the mountains and in Thistle Valley. That during high water season, there is usually more water than is required by the parties

to this action, but during the period of low water there is not sufficient water to supply the needs of the parties for the irrigation of their lands, but there is always sufficient water to provide water for livestock. * * *"

The court also found that the parties to this action all maintained tight dams at their various points of diversion during the period extending from September 1 to May 15 of the following year for the purposes of diverting the water of Thistle Creek onto their lands for irrigation and stock watering purposes, and that the Lassons had maintained their watertight dams on their upper meadows until June 25 of each year, and all of the parties have maintained watertight dams from and after July 15 at their respective points of diversion to get whatever small quantity of water was available in Thistle Creek for cultivation of their lands and stockwatering purposes. That the Lassons had beneficially used during the irrigation season, which extends from about March 1 to November 1, ¾ths of the total flow of Panawats Slough and Thistle Creek above the McKean-Spencer Dam "from June 25th to June 30th and From July 10th to July 15th of each and every year, and four-fifths of the total flow of said creek and slough measured at the upper Wimmer Dam during the remainder of the period from May 15th to July 15th of each year." and that one of the Lassons and his predecessors in interest had during the irrigation season beneficially

used all of the waters of the Panawats Slough except during the period when the parties took their turns under the Smith Decree. The court also found that the parties had never rotated turns in using the waters of Panawats Slough and Thistle Creek and that it did not appear it would be practical to rotate the use of such waters. As to this matter of rotating, there was evidence that during low water season when the parties would naturally be interested in getting all the water they could, the water sudden rainstorms when the creek would supply was dependent upon freshets or fill up, and since no one could know when such storms would come, the one who would have a turn at such time would benefit and the one whose turn came at another time might get nothing.

From its findings the court concluded and decreed that the Lassons had the right to maintain checks and watertight dams in Thistle Creek, and to divert and redivert all of the waters of Thistle Creek and Panawats Slough onto their upper meadow lands from September 1 to June 25 of the following year, and for their lower meadows to divert all of the waters until May 15 for the purpose of irrigation. From May 15 to July 15 of each year they were to receive ⅘ths of the water measured at the upper Wimmer Dam and during the time the Smith Decree is in effect, ¾ths of all the water of Thistle Creek and Panawats Slough between the boundary line of Utah

and Sanpete Counties and the McKean-Spencer Dam.

■ Appellants contend that the court erred in holding that the Lassons hold rights prior to them to the use of the waters of Thistle Creek and its tributaries and leaving only the return flow and seepage to them, and that it also erred in failing to place reasonable regulations on the use of the waters by all the parties and in failing to divide the water equally between the parties to this suit in direct proportion to the irrigated acreage of each. We cannot agree with these contentions. From all the evidence introduced it was reasonable for the court to find that all the parties to this suit and their predecessors in interest had beneficially used the waters involved herein since prior to 1903 in the manner and at the times and in the amounts as outlined above. Whether regulations should be imposed is within the discretion of the court. It has the right to do so if it deems it necessary. In the instant case the parties have had no trouble concerning the distribution and use of the waters until the past few years before the commencement of this suit, which were dry years and water was scarce and one of the plaintiffs heard one of the Lassons claiming all the water in Panawats Slough. Plaintiffs then decided to have their rights determined by a court. As we have shown, the expert testimony was to the effect that the waters had been placed to a beneficial use in one of the best manners possible considering the terrain and other factors so that all the parties to this suit benefited thereby, and there was also testimony from which it was reasonable for the court to conclude that hard and fast regulations could prove harmful rather than beneficial. As we said in McNaughton v. Eaton, 4 Utah 223, 291 P.2d 886, on page 887;

■ "* * * Detailed regulations of the right to use water should be imposed with great caution for usually the parties can agree upon the necessary regulations to meet the necessities as they arise and therefore it is better to do this than for the court to impose hard and fast regulations which cannot be changed to meet emergencies."

In that case the trial court made many detailed regulations, we affirmed only a part of the regulations imposed by the trial court. Under the facts here shown it cannot be said that the court abused its discretion in failing to make regulations.

■ We have considered appellants' contention in regard to the court's abusing its discretion in assessing all the costs against them and find no merit to it.

Affirmed. Costs to respondent.

McDONOUGH, C. J., and CROCKETT, HENRIOD and WORTHEN, JJ., concur.